UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JOHN W. COLE,

                                Petitioner,

     v.                                           9:23-CV-1555
                                               (BKS)

J. CLINTON,

                                Respondent.

_____

APPEARANCES:                            OF COUNSEL:

JOHN W. COLE
Petitioner Pro Se
19-A-4291
Ulster Correctional Facility
P.O. Box 800
Berme Road
Napanoch, New York 12458

HON. LETITIA JAMES                      JAMES FOSTER GIBBONS, ESQ.
Attorney for Respondent                Ass't Attorney General
New York State Attorney General
The Capitol
Albany, New York 12224

BRENDA K. SANNES
Chief United States District Judge

## DECISION and ORDER

## I.     INTRODUCTION

       Petitioner John W. Cole seeks federal habeas relief pursuant to 28 U.S.C. § 2254.

Dkt. No. 1, Petition ("Pet.")[1]; Dkt No. 1-1-1-4, Exhibits.[2]  Respondent filed a limited answer

---

[1]  The case was initially filed in the United States District Court for the Western District of New York; however, it was transferred to this district on December 12, 2023.  Dkt. No. 2, Transfer Order; Dkt. No. 3.

[2]  For the sake of clarity, citations to all parties' filings refer to the pagination generated by CM/ECF, the Court's electronic filing system.

addressing the issue of timeliness.  Dkt. No. 4, Decision and Order ("December Order")

(directing the limited answer); Dkt. No. 18, State Court Records; Dkt. No. 19, Limited Answer.

Petitioner filed a reply.  Dkt. No. 21, Traverse; Dkt. No. 22, Letter in Support.

For the reasons which follow, the petition is denied and dismissed as untimely.

## II.    RELEVANT BACKGROUND

### A.    State Court Criminal Proceedings

As is relevant to the instant action, the undersigned will rely upon the facts detailed by

the state courts during petitioner's direct appeal.  *See People v. Cole*, 177 A.D.3d 1096, 1098

(3rd Dep't 2019).

> [On March 11, 2017, a]fter an evening out with several couples
> during which the group had dinner and went to see a band at a
> bar, [petitioner] and his wife left the bar around midnight to return
> home with Deanna Shapiro [(hereinafter the victim)] and Scott
> Schapiro.  [Petitioner] was driving, his wife was in the passenger
> seat and the Shapiros were riding in the back seat of the car.
> Scott Schapiro (hereinafter Schapiro) testified that he asked
> [petitioner] if he was OK to drive, and [petitioner] "indicated that he
> was fine to drive and that he had been drinking water for the
> previous hour." . . . Shapiro testified that he had about five or six
> drinks, and thought his wife 'had close to the same.'  According to
> Shapiro, [while they were driving home petitioner]  . . . accelerated
> as fast as he could accelerate . . . [and] he and his wife both asked
> [petitioner] to slow down and [petitioner] responded with words "to
> the effect of don't tell me what to do or shut up[.]"

*Id*. (internal alternations omitted).  Petitioner then lost control of the car.  *Id.*  The victim

provided similar testimony about the events which occurred immediately prior to the accident.

*Id.*

At the scene of the accident, petitioner told law enforcement "that he lost control trying

to avoid a construction sign in the road."  *Cole*, 177 A.D.3d at 1098-99.  A State Trooper

testified that he did not believe petitioner's story because petitioner's breath smelled of

alcohol, petitioner had bloodshot and glassy eyes, and petitioner failed four field sobriety tests.  *Id.* at 1099.  Petitioner reported "that he had two to three beers, but later admitted that he had four or five beers over the course of the evening."  *Id.*

The Trooper also explained that "the vehicle [that petitioner was driving] initially went off the south side of the road, sheered off a fire hydrant and then crossed back over both lanes over the north shoulder into a construction area where it appeared to have hit a tree."  *Cole*, 177 A.D.3d at 1099.  A second State Trooper provided similar testimony about the description of the accident and corroborated that petitioner smelled like alcohol at the accident scene.  *Id.*  The accident reconstructionist "explained that there were no mechanical issues with the car, there were no markings to indicate that [petitioner] braked during the accident and that [petitioner] was going 58 to 78 miles per hour," in a 40 mile per hour zone with signage warning of a curve ahead in the road.  *Id.*  An independent consultant testified to the sophisticated maneuvering capabilities of petitioner's high-performance vehicle, but also indicated that "the vehicle's mechanical systems were intact [and] . . . no braking occurred and that the accelerator pedal was at 99 to 100 percent."  *Id.* (internal alterations omitted).

As a result, the victim sustained injuries leaving her paralyzed from the neck down.  *Cole*, 177 A.D.3d at 1098.

In his defense, petitioner had "multiple witnesses who were present during the evening's events testif[y] as to [petitioner's] sobriety."  *Cole*, 177 A.D.3d at 1099.  Petitioner's wife also confirmed that her husband "was drinking nonalcoholic beverages" and that a sign blew into the road -- causing her to scream and petitioner to swerve -- immediately prior to petitioner losing control of the vehicle.  *Id.*

A jury ultimately convicted petitioner of second-degree assault based on a theory of

3

recklessness, driving while ability impaired, and reckless driving. *Cole*, 177 A.D.3d at 1097. Petitioner was sentenced to seven years' incarceration and three years of post release supervision to run concurrently with other sentences on lesser convictions. *Id.*

### B.    Direct Appeal

Petitioner filed a counseled appeal arguing that (1) the county court abused its discretion when it allowed the prosecution to question petitioner about a burglary conviction from 1991; (2) the county court improperly limited petitioner's counsel's summation regarding comments about a civil action the Schapiros intended to pursue against petitioner for the victim's injuries; and (3) petitioner's sentence was harsh and excessive. *Cole*, 177 A.D.3d at 1100-03. The Third department affirmed the conviction. *Id.* at 1103. On November 26, 2019, the New York Court of Appeals denied petitioner's application for leave to appeal. *People v. Cole*, 34 N.Y.3d 1015 (2019).

### C.    440 motion

On December 29, 2021, petitioner also collaterally attacked his conviction by filing a counseled motion to vacate his judgment pursuant to New York Criminal Procedure § 440.10 ("440 motion"). *See People v. Cole*, 217 A.D.3d 1185, 1185 (3rd Dep't 2023); Pet at 21. The 440 motion was denied by the Saratoga County Court, without a hearing, on June 13, 2022. *Cole*, 217 A.D.3d at 1185.

On appeal, petitioner argued that he was entitled to relief because his trial counsel was constitutionally ineffective for (1) failing to obtain the Shapiros' criminal histories and relevant medical records prior to the start of the trial; (2) preventing petitioner from testifying on his own behalf and presenting an adequate defense; and (3) failing to move for a mistrial after the county court accused petitioner of engaging in dishonest and deceitful misconduct.

4

*Cole*, 217 A.D.3d at 1186-88.  The Third Department affirmed the denial of petitioner's motion.  *Id.* at 1188.

## III.    THE PETITION

Petitioner argues that he is entitled to federal habeas relief because (1) his trial counsel was constitutionally ineffective, Pet. at 6, 36-47; (2) the trial court erred when it improperly suppressed various *Brady* and *Giglio* evidence, *id.* at 7, 48-51; (3) false evidence was unlawfully submitted before the court in violation of petitioner's rights, *id.* at 7; (4) petitioner was forced to give up his constitutional right to testify, *id.* at 7, 51; and (5) his sentence was harsh and excessive, *id.* at 53-55.

Respondent opposes the petition, arguing that the case should be dismissed because the action is both untimely and unexhausted.  Dkt. No. 19-1 at 15-21.  Alternatively, respondent also contends that petitioner's claims are unexhausted and meritless or not cognizable on habeas review.  *Id.* at 21-38.

Petitioner admits that his petition appears to be filed beyond the expiration of the statutory limitations period.  Pet. at 16.  However, petitioner also argues that equitable tolling should apply because "[e]xtraordinary [c]ircumstances . . . prevented [him from] filing [a] Federal Writ[;]" therefore, "[e]quitable tolling would be just and proper."  *Id.*  Specifically, petitioner contends that (1) attorney abandonment; (2) his daughter's unexpected and tragic passing; (3) the global COVID-19 pandemic and (4) failure to timely receive documents from prior counsel all constitute extraordinary circumstances that should entitle him to equitable tolling.  *Id.* at 17-20, 23-24; *see also* Traverse at 1, 3.  Further, reading the pro se pleading in the light most favorable to petitioner, his assertion that he is actually innocent constitutes an equitable exception potentially capable of allowing the undersigned to still review the merits

of petitioner's otherwise time-barred claim.  Pet. at 24-34; Traverse at 2-3.

## IV.    DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), enacted on April 24, 1996, established a one-year statute of limitations for prisoners to seek federal review of their state court criminal convictions.  28 U.S.C. § 2244(d)(1).  The one-year period generally begins to run from the date on which the state criminal conviction became final by the conclusion of direct review or by the expiration of the time to seek direct review.  28 U.S.C. § 2244(d)(1)(A); *Gonzalez v. Thaler*, 565 U.S. 134, 149-50 & n.9 (2012).  However, other dates from which the limitations period may start running are (1) the date on which an unconstitutional, state-created impediment to filing a habeas petition is removed; (2) the date on which the constitutional right on which the petitioner bases his habeas application was initially recognized by the Supreme Court, if the right was newly recognized and made retroactively applicable; or (3) the date on which the factual predicate for the claim or claims presented could have been discovered through the exercise of due diligence (newly discovered evidence).  *See* 28 U.S.C. § 2244(d)(1)(B)-(D).[3]

Here, petitioner's conviction was affirmed by the Court of Appeals on November 26, 2019.  *Cole*, 34 N.Y.3d at 1015.  Accordingly, petitioner's conviction became "final" for purposes of the AEDPA ninety days later, on February 24, 2020, when the time to seek certiorari expired.  *Thaler*, 565 U.S. at 149.  Petitioner had one year from that date, or until

---

[3]  In light of the global pandemic, the Supreme Court issued a general order declaring that for a lower court decision filed between March 19, 2020, and July 18, 2021, the deadline for applying for certiorari would be temporarily extended from ninety days to 150 days.  *See* 334 F.R.D. 801 (U.S. Mar. 19, 2020), *available at* https://www.supremecourt.gov/orders/courtorders/031920zr_d1o3.pdf (extending deadline); U.S. Sup. Ct. Orders Rescinded, 28 U.S.C. (U.S. July 19, 2021), *available at* https://www.supremecourt.gov/orders/courtorders/071921zr_4g15.pdf (rescinding pandemic-instituted protocols). However, because the Court of Appeal's denied petitioner's application for leave to appeal in 2019, the expanded limitations period is inapplicable to this timeliness calculation.

February 24, 2021, to file a timely federal habeas petition.[4]  The present petition, placed in the prison mailing system on October 31, 2023, was filed over two years and eight months too late.[5]

### A.    Statutory Tolling

The one-year limitation period under AEDPA is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2); *Saunders*, 587 F.3d at 548.  The tolling provision excludes from the limitations period only the time that the state relief application remained undecided, including the time during which an appeal from the denial of the motion was taken.  *Saunders*, 587 F.3d at 548; *Smith v. McGinnis*, 208 F.3d 13, 16 (2d Cir. 2000) (per curium).  Further, the tolling provision does not reset the date from which the one-year statute of limitations began to run.  *Smith*, 208 F.3d at 17.

However, statutory tolling is of little benefit here because petitioner's 440 motion was filed on December 29, 2021, more than ten months past the expiration of the limitations period.  *See Duhs v. Capra*, 180 F. Supp. 3d 205, 222 (E.D.N.Y. 2016) ("[F]iling a section 440 motion does not revive the limitations period for a habeas petition.") (citing *inter alia Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (explaining statutory tolling "does not reset the date from which the one-year statute of limitations begins to run."); *Rashid v. Khulmann*, 991 F. Supp. 254, 259 (S.D.N.Y. 1998) ("The tolling provision does not . . . restart the clock at zero[];

---

[4]  According to Rule 6(a) of the Federal Rules of Civil Procedure, "[w]hen a statute of limitations is measured in years, the last day for instituting the action is the anniversary date of the state of the limitations period."  *Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir. 1998).  "The anniversary date is the 'last day to file even when the intervening period includes the extra leap year day.'"  *Ryan v. Griffin*, No. 9:10-CV-0395 (MAD/ATB), 2011 WL 6934269, at *3 (N.D.N.Y. Dec. 30, 2011) (quoting *United States v. Hurst*, 322 F.3d 1256, 1260 (10th Cir. 2003).

[5]  Under the prison "mailbox rule," a petitioner's application is deemed filed on the date he delivers it to the prison authorities for mailing.  *Houston v. Lack*, 487 U.S. 266, 270 (1988).

it can only serve to pause a clock that has not yet fully run.  Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations.").

Consequently, statutory tolling does not save petitioner's claims from being deemed untimely.

### B.    Equitable Tolling

The AEDPA's one-year statute of limitations period "is subject to equitable tolling in appropriate cases."  *Holland v. Florida*, 560 U.S. 631, 645 (2010).  To warrant equitable tolling, a petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing."  *Id.* at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *Diaz v. Kelly*, 515 F.3d 149, 153 (2d Cir. 2008).

> To show that extraordinary circumstances 'prevented' him from filing his petition on time, [P]etitioner must 'demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the [P]etitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances.

*Hizbullanhankhamon*, 255 F.3d at 75 (quoting *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000)).

### i.    Attorney Misconduct

Petitioner first argues that attorney misconduct should act to equitably toll his limitations period.  Specifically, petitioner indicates that after his direct appeal has concluded, on January 15, 2020, he retained different counsel, Anthoney Capetola, to file a collateral attack on his state court conviction.  Pet. at 18.  Petitioner contends that for a year the attorney did not do any research or file any motions; however, after investing $200,000 in the

representation, he "had to wait on [counsel]." *Id.* at 19, 55.  Petitioner eventually fired

Capetola on January 27, 2021.  *Id.* at 19.  While petitioner attempted to retain another

counsel, he could not secure representation until April of 2021.  *Id.*

　　　"Because a lawyer is the agent of his client, the client generally must bear the risk of

attorney error. . . Therefore, a garden variety claim of excusable neglect, such as a simple

miscalculation that leads a lawyer to miss a filing deadline, does not warrant equitable

tolling."  *Rivas v. Fischer*, 687 F.3d 514, 538 (2d Cir. 2012) (quoting *Holland v. Florida*, 560

U.S. 631, 650-52 (2010)) (internal quotation marks omitted).  Accordingly, "attorney

negligence must be so egregious as to amount to an effective abandonment of the attorney-

client relationship."  *Id.* (citing *Holland*, 560 U.S. at 651).  Further, "a client [cannot] be faulted

for failing to act on his own behalf when he lacks reason to believe his attorneys of record . . .

are not representing him."  *Maples v. Thomas*, 565 U.S. 266, 283 (2012).  More specifically,

> [i]nstances of attorney misconduct that have been deemed sufficiently "extraordinary" include an attorney's abandonment of an appeal mid-process resulting in procedural default, *see Maples[,* 565 U.S. at 274–75]; a court-appointed attorney's failure to file a timely petition for habeas relief despite a series of letters from the client noting the importance of the deadline and citing the applicable legal rules, *see Holland*, 560 U.S. at 652; an attorney retained for post-conviction relief who "did virtually nothing for almost a year," despite many requests for updates from the client who was eventually forced to file a pro se appeal, *Martinez v. Supt. of E. Corr. Facility*, 806 F.3d 27, 29–30 (2d Cir. 2015); an attorney who miscalculated the last date for filing a timely habeas petition despite repeated requests from the client that the lawyer file well in advance of it to avoid just that result, *Dillon v. Conway*, 642 F.3d 358, 363–64 (2d Cir. 2011); and an attorney who told his client, after performing no legal research, that the time to file a habeas petition had passed, even though fourteen months remained, and who additionally failed to communicate with the client despite the client's efforts to reach him, *Baldayaque v. United States*, 338 F.3d 145, 152 (2d Cir. 2003).

*Joaquin v. Smith*, No. 1:21-CV-9372, 2022 WL 18956531, at *5 (S.D.N.Y. Dec. 30, 2022),

*report and recommendation adopted by*, 2023 WL 2237798 (S.D.N.Y. Feb. 27, 2023) (alternations in original omitted).

Here, it appears arguable that Capetola's actions may have amounted to abandonment. Given petitioner's categorization that he was "scammed" by Capetola, it does not appear that petitioner was under the illusion that the attorney was zealously advocating for him during most of the year-long period he was retained. Accordingly, this situation seems akin to the petitioner in *Martinez*, whose counsel "accepted [thousands of dollars] and then did virtually nothing for almost a year." *Martinez*, 806 F.3d at 30. There, the district court correctly determined that extraordinary circumstances impeded Martinez's ability to file his habeas petition. *Id.* at 31.

However, the question remained whether petitioner acted diligently during that period. The Second Circuit discussed

> four factors relevant to a diligence inquiry "in the attorney incompetence context": (1) "the purpose for which the petitioner retained the lawyer," (2) "his ability to evaluate the lawyer's performance," (3) "his financial and logistical ability to consult other lawyers or obtain new representation," and (4) "his ability to comprehend legal materials and file the petition on his own.

*Martinez*, 806 F.3d at 31-32 (quoting *Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004)).

The first factor favors the petitioner. As petitioner indicated, he had three different sets of counsel to represent him through the conclusion of his direct appeal. Pet. at 17. Petitioner separately retained Capetola to file a 440 motion. *Id.* at 17-18. However, petitioner also indicates that, when Capetola visited him in January of 2020 at Bare Hill Correctional Facility, Capetola was planning on "filing either [a] 440 motion or Federal Writ soon[.]" *Id.* at 18. Consequently, it seems petitioner was under the impression that Capetola was initially retained "to handle all his post-conviction relief, including a potential federal habeas petition,"

*Martinez*, 806 F.3d at 32.

　　　The second factor does not favor petitioner.  Unlike Martinez's counsel, who prevented "Martinez's ability to evaluate his lawyer['']s performance . . . by . . . active concealment of [the] firm's poor performance," *Martinez*, 806 F.3d at 32, here, petitioner did not seem to be under any illusions that Capetola was working diligently on his behalf.  Outside of visiting petitioner at the correctional facility on January 15, 2020, petitioner states that "Capetola was not answering any of [his] phone calls," and they "had to badger Capetola for [four] months to get detailed billing statements."  Pet. at 19.  When petitioner finally spoke to Capetola, on January 27, 2021, Capetola "became combative and verbally abusive . . . [and] the relationship ended."  *Id.*  In stark contrast from the consistent billing statements, requests for information, and letters that the petitioner in *Martinez* was receiving from his retained counsel – implying that the firm was working diligently on his post-conviction challenge – Capetola was non-responsive, dismissive, and combative.  Therefore, Capetola was not performing on petitioner's behalf and petitioner needed to pursue other avenues to ensure his rights were being vindicated.

　　　The third factor also does not favor petitioner.  Petitioner contends that it was difficult to retain another counsel after he parted ways with Capetola because "[t]rying to find [an] Attorney while incarcerated is extremely difficult."  Pet. at 20.  However, as discussed above, it seems that petitioner was aware that he was being abandoned fairly early in their relationship given Capetola's behavior.  Petitioner did not state that he was, by financial means or otherwise, precluded from immediately obtaining another counsel.  Instead, petitioner indicated that he felt like, given the size of the retainer that he provided Capetola, he wanted to wait things out.  Pet. at 19, 55.  Further, the record belies any assertion that

petitioner lacked the funding to find other representation.  In fact, petitioner made several comments about his financial means, so even though a $200,000 investment would be an entire lifetime's worth of earnings for some, it did not appear to be so for petitioner.  *See* Pet. at 31 (explaining that, after reaching an insurance settlement, Schapiro insisted on another $10 million from petitioner personally so petitioner "wrote him a check for $140,000 to cover the cost of home health aids and had no problem continuing to help.  But [petitioner] refused to bankrupt [his] business to meet [Schapiro's] 10 million dollar demand."); Pet. at 36 (representing that his trial counsel had "unlimited funds available to [her to] hire expert defense witnesses[.]").  It seems petitioner made a conscious choice to wait on Capetola to see whether his investment would eventually pan out, and, unfortunately for petitioner, it did not.

The final factor is neutral, at best.  While petitioner did not have any formal legal expertise or training, he was a savvy businessman.  Petitioner did eventually successfully commence the instant pro se action.  The question is whether petitioner's reliance on his retained counsel prevented him from further exploring his pro se options.  Again, because petitioner characterizes his relationship with Capetola as, at best, unproductive and, at worst, volatile, it would seem petitioner would reasonably presume that he should probably look into filing matters on his own behalf.

In sum, even though Capetola's actions arguably constituted extraordinary circumstances, petitioner failed to demonstrate that he was reasonably diligent for the time in question.

Even assuming the undersigned is incorrect, and equitable tolling should apply for the time that Capetola was acting as petitioner's counsel, his present pleading would still be

untimely because, for the reasons which follow, equitable tolling does not apply for any of the other time after Capetola was fired in January of 2021.[6]

### ii.    Failure to Receive State Court Documents/Client Files

After parting ways with Capetola, petitioner retained Terry Kindlon in April of 2021; however, petitioner states he could not obtain his client file from Capetola until June 25, 2021.  Pet. at 19, 55.  Kindlon eventually filed petitioner's counseled 440 motion on December 29, 2021.  *Id.* at 21.

On June 22, 2023, after the Third Department affirmed the denial of petitioner's counselled 440 motion, petitioner claims Kindlon "g[ave] up" any further fighting, leaving petitioner to advocate for himself.  Pet. at 23.  Petitioner contends he was unable to file anything pro se, including the instant petition, until he acquired all his state court records from his various attorneys.  *Id.*  According to petitioner, this process took weeks, in part due to the facility losing his documents.  *Id.*  Consequently, petitioner did not have full possession of the state court record until September of 2023.  *Id.* at 48.  The petition was signed and dated October 30, 2023.  *Id.* at 68.

Petitioner makes the same equitable tolling claim for two separate time periods that relate to the provision of documentation.  First, petitioner argues that the period between his conviction becoming final and when Kindlon received his client file, on June 25, 2021, should be equitably tolled.  Pet. at 20.  Second, petitioner contends that after Kindlon "gave up"

---

[6]  Assuming equitable tolling applied to the period from the conviction becoming final, February 24, 2020, until the day Capetola was terminated, January 27, 2021, the limitations period would have been tolled for 338 days.  Accordingly, after the statutory limitations period expired, on February 24, 2021, the tolled time period would commence.  A total of 308 (of the 338) days passed until the 440 motion was filed by Kindlon on December 29, 2021.  After the decision and appeals on the 440 motion were completed, on June 22, 2023, that means there were an additional 30 days left in the tolled period. So, to be timely, the petition would have to be filed by the end of July.  However, the petition was not filed until the end of October, months beyond the expiration of the tolled time.  Therefore, unless other periods of time are equitably tolled, the petition remains untimely.

representing him, it took him weeks before he received all his records from all his prior counsel. Pet. at 23-24. Further, the facility mail temporarily lost the records. *Id.* at 24. Therefore, tolling should apply.

However, that argument has already been denied by this Court. This is because "[a]n ordinary lack of access or inability to obtain documents does not warrant equitable tolling," instead, "[s]uch denial of access to necessary papers typically requires some event that effectively prohibits the petitioner from pursuing habeas[.]" *Stein v. Stallone*, No. 9:17-CV-0670 (BKS), 2019 WL 5578236, at *8 (N.D.N.Y. Oct. 29, 2019) (citations and original alterations omitted). "While petitioner appears to argue that the materials in question were intentionally kept from him . . . the key is some event that effectively prohibits the petitioner from pursuing habeas . . . not from pursuing documents [and t]he circumstance did not prevent petitioner from filing a timely petition." *Id.* (citations and original alterations omitted). The same is true here.

Further, as also discussed in *Stein*, there are methods to seek relief from the various courts if one believes they are entitled to discovery that is being wrongly withheld. 2019 WL 5578236, at *8. "Thus, all of the materials petitioner alleges were withheld could have been sought after a timely federal petition was filed." *Id.* (citing cases).

### iii.    Unexpected Death of Petitioner's Daughter

Petitioner also argues that his daughter's unexpected death, on March 5, 2020, should equitably toll the limitations period because he was overwhelmed with grief and unable to function after his loss. Pet. at 18.

While the death of petitioner's daughter is undoubtedly tragic, it is insufficient to trigger tolling. First, petitioner presents only conclusory statements about the consequences of his

14

loss, failing to provide specific details about when and how it precluded him from filing the instant action.  Second, petitioner has failed to provide, nor has the undersigned uncovered, "any authority to support [his] position that the medical or mental conditions of a third party – as opposed to [petitioner himself] – constitute 'extraordinary circumstances' sufficient to justify equitable tolling." *Rizzo v. United States,* No. 1:17-MC-1415, 2024 WL 1117021, at *11 (E.D.N.Y. Mar. 14, 2024) (citing *Thomas v. Burmax Co.*, No. 2:12-CV-6363, 2013 WL 6681616, at *4 (E.D.N.Y. Dec. 18, 2013)).  Third, even assuming such a loss could be an extraordinary circumstance, it occurred just under a year before the expiration of the limitations period and several years before the instant action was commenced.  Such a loss occurring substantially before the limitations deadline has been found "insufficient to warrant equitable tolling, as the temporal gap between the death of [petitioner's child] and the filing deadline undermines an assertion that [petitioner] was hindered in his ability to file a timely § 2254 petition." *Thomas v. Pennsylvania*, No. 4:17-CV-2164, 2019 WL 2296581, at *2 (M.D. Pa. May 30, 2019) (holding that the death of petitioner's child approximately two years before the expiration of the limitations period did not entitle petitioner to tolling).

### iv.    COVID-19

Numerous district courts in the Second Circuit have found the Covid-19 pandemic to qualify as an extraordinary circumstance for equitable tolling purposes.  *Mighty v. United States*, No. 6:15-CR-06109, 2021 WL 3036926, at *2 (W.D.N.Y. July 19, 2021) ("[T]he Court may be inclined to find that the circumstances of . . . the COVID-19 outbreak at FCI Elkton are 'extraordinary' and sufficient to equitably toll the limitations period[.]"); *Cottell v. Reardon*, 7:22-cv-1178, 2023 WL 3852384, at *4 (S.D.N.Y. Mar. 10, 2023) ("[T]here is no question that COVID constituted an extraordinary circumstance[.]"); *Maris v. Fields*, 1:20-CV-1451, 2021

WL 4311140, at * 2 (E.D.N.Y. Sept. 22, 2021) ("There is no question that the pandemic constituted an extraordinary circumstance[.]").  This Court finds no reason to differ from its sister courts and agrees with petitioner that COVID-19 qualifies as an extraordinary circumstance.

However, to establish equitable tolling, a petitioner must demonstrate both extraordinary circumstances *and* that they diligently pursued their remedies despite the extraordinary circumstances.  *Holland*, 560 U.S. at 418; *see also Maris*, 2021 WL 4311140, at *2 (finding that COVID-19 was an extraordinary circumstance but dismissing the claim for equitable tolling on diligence grounds because the prisoner "says literally nothing about any actions he undertook or attempted in order to advance his petition in the period he seeks to have tolled."); *Cottell*, 2023 WL 3852384, at *4 (finding that prisoner's equitable tolling claim fails because the prisoner does not "proffer anything regarding his efforts to contend with the extraordinary circumstances[]" brought on by COVID-19).

Here, petitioner asserts that he should be provided with two periods of equitable tolling due to the global pandemic because (1) COVID closed the state courts from March of 2020 through November of 2020, Pet. at 18; and (2) it was difficult to secure representation after Capetola because "most attorneys [we]re busy and ha[d] COVID backlogs," Pet. at 20.

With respect to petitioner's first claim, petitioner fails to provide any details about how the closure of the state courts prevented him from filing a habeas corpus petition in federal court.  Furthermore, even crediting petitioner's claim, those months occurred within the time period of potential equitable tolling for petitioner's attorney misconduct claim.  As further discussed in that section, even providing petitioner with tolling for that time period still does not save the timeliness of the instant action.

With respect to petitioner's second claim, like the prisoners in *Maris* and *Cottell*, petitioner offers nothing beyond a one sentence, conclusory allegation to show he diligently pursued his rights during this time period.  Accordingly, the Court finds that petitioner failed to diligently pursue his claim, and, therefore, is not entitled to equitable tolling.

## C.    Equitable Exception

Courts have also recognized an equitable exception to the one-year statute of limitations under 28 U.S.C. §2244(d)(1) in cases where a petitioner can prove actual innocence.  *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013).  It is important to stress that "[o]nce guilt is . . . established . . . a federal habeas court will not relitigate the question of guilt for a state defendant who protests his actual innocence . . . [r]ather, a federal habeas court will review state convictions for constitutional error."  *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019).

An actual innocence claim will be recognized only in a "narrow class of truly extraordinary cases [where a petitioner can] present[] credible and compelling claims of actual innocence."  *Hyman*, 927 F.3d at 656 (citing *Schlup*, 513 U.S. at 315) (internal quotation marks omitted); *see also House*, 547 U.S. at 538 (noting that the actual innocence gateway standard is "demanding and permits review only in the extraordinary case.") (internal quotation marks omitted).  "The petitioner's burden in making a gateway showing of actual innocence is deliberately demanding."  *Hyman*, 927 F.3d at 656 (citing cases).  "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence–that was not presented at trial."  *Schlup*, 513 U.S. at 324; *see also Rivas v. Fischer*, 687 F.3d 514, 518 (2d Cir. 2012); *Whitley v. Senkowski*, 317

F.3d 223, 225 (2d Cir. 2003).  In addition, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327);[7] *see also Doe*, 391 F.3d at 160-62.

"The standard's demand for evidence *of innocence* references factual innocence, not mere legal insufficiency."  *Hyman*, 927 F.3d at 657 (quoting *Schlup*, 513 U.S. at 316 & *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)) (internal quotation marks omitted).  In clarifying what this standard requires, the Second Circuit explained:

> a reviewing court assessing the probability of actual innocence is not limited to the trial record.  To the contrary, it "must consider all the evidence, old and new, incriminating and exculpatory," *House v. Bell*, 547 U.S. at 538 . . . (internal quotation marks omitted), and, in doing so, "is not bound by the rules of admissibility that would govern at trial," *Schlup v. Delo*, 513 U.S. at 327 . . . This is because, at the gateway stage of inquiry, a habeas court's task is not to identify trial error or to delineate the legal parameters of a possible new trial.  It is to identify those cases in which a compelling showing of actual innocence would make it a manifest injustice to maintain conviction unless it was free of constitutional error.  Thus, incriminating evidence obtained in the course of an unlawful search, or custodial admissions made in the absence of Miranda warnings, may well be inadmissible at trial.  Nevertheless, such evidence is properly considered in assessing factual innocence, with the manner of procurement informing reliability and relevance and, therefore, weight.

*Id*. at 658.

Here, petitioner cannot meet this high burden.  First, petitioner must show the existence of newly discovered evidence that is compelling and reliable because it is either scientifically derived, credible eyewitness testimony, or critical physical evidence.  *See*

---

[7]  *Schlup* and *House* involved procedurally defaulted claims.  *See McQuiggan*, 569 U.S. at 386.  The Supreme Court in *McQuiggan* held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, the expiration of the statute of limitations." *Id*.

*Schlup*, 513 U.S. at 324. However, petitioner has generally failed to introduce any new evidence and, that which he does, is neither compelling nor reliable.

First, petitioner makes several arguments about missing evidence which he felt would undermine the credibility of the prosecution witnesses and strengthen his defense. Specifically, petitioner contends that if the jury would have known the Blood Alcohol Content ("BAC") of Shapiro and the victim, it would have diminished their credibility to the extent that petitioner's defense would have been more successful. Pet. at 27 (explaining that the BAC data "could have been [used to] impeach[ Shapiro, or, a]t the very least, [create] reasonable doubt as to his credibility."). Further, petitioner argues if the trial court would have allowed petitioner's counsel to further probe into the civil settlement that petitioner and the Shapiros entered in to, it also would have further eroded Shapiro's credibility because it would have refuted any claims of financial ruin and destitution as the result of the victim's paralysis. Pet. at 31-34. Finally, petitioner took objection to the trial court's in camera review, and eventual redaction, of a journal that belonged to Shapiro. Pet. at 45-47. Petitioner contends that

> the diary provided material evidence of both prosecution witnesses memory of the accident, and their state of mind on a number of factors following the accident. Factors that may have had an influence on the truthfulness of their trial testimony. **The diary clearly had the propensity to be impeaching in nature[.]**

Pet. at 49.

Second, petitioner argues that if he had the victim's or Shapiro's medical records or hired an expert it would have been easy to calculate BAC data for both the victim and Schapiro. Pet. at 25-30, 37-38. Petitioner represented that it was common practice for individuals to undergo toxicology screens and BAC testing after an accident, so petitioner surmised that the evidence was available, it just was purposefully not provided to him. Pet. at

41-42. [8]  Petitioner states that calculating the BAC would have been easy had anyone applied the Widemark Formula, a scientific calculation petitioner learned about during his DWI programming.  Pet. at 25-30.  In demonstrating its ease of applicability, petitioner utilized the formula to create data which he claims supports his current actual innocence claim.  Pet. at 29.

There are several issues with petitioner's arguments.  The first is attempting to use the actual innocence gateway to introduce pieces of evidence solely for impeachment purposes.  "Indeed, the Supreme Court has stated that newly discovered impeachment evidence is a step removed from evidence pertaining to the crime itself and tends only to impeach the credibility of the witness," instead of actually demonstrating actual innocence.  *Jones v. Annucci*, 124 F. Supp. 3d 103, 124 (N.D.N.Y. 2015) (citing *Calderon v. Thompson*, 523 U.S. 538, 563 (1998)) (internal quotation marks omitted).

Here, even assuming that the Shapiros BACs were higher than what the testimony indicated or that they lied about how dire their financial situation was, none of that proves that petitioner is actually, factually innocent.  Further, the insinuation that the Shapiros were not fully credibly was made when petitioner's counsel cross examined the victim and Shapiro about inconsistencies in their testimony and recollection.  Pet. at 28, 32.  However, making those witnesses potentially even more unreliable does not detract from the other testimony which was proffered by credible sources.

---

[8]  While petitioner makes allegations about not knowing the victim's BAC, petitioner later concedes that information was provided to trial counsel when the prosecutor gave the defense various discovery materials on the eve of trial.  Pet. at 25-26.  Further, the trial judge conducted an in-camera review of the victim's medical records and determined that petitioner's counsel ultimately received all of the information which she requested.  Pet. at 42-44.  Accordingly, because the victim's BAC and medical records where produced and the subject of in camera review, they do not constitute new evidence.  *See United States v. White*, 972 F.2d 16, 20 (2d Cir. 1992) (defining new evidence as that which "could not with due diligence have been discovered before or during trial.")  Both of these issues were known to petitioner at the time of his trial.

Specifically, petitioner's conviction was based not only on the testimony of the victim and Shapiro, but also on the testimony of several law enforcement officers that reported petitioner smelled like alcohol and failed multiple field sobriety tests.  Law enforcement also highlighted that petitioner was initially untruthful when he disclosed the amount of alcohol that he had consumed that night.  Both they, and an accident reconstructionist, provided testimony about the accident, indicating that petitioner was driving considerably faster than the posted speed limit, around a curve, in the middle of a construction zone, without depressing the brakes, and with the accelerator at full throttle.  It seems that the jury chose to believe the testimony of the officers and the accident reconstructionist.  Federal courts cannot disturb such credibility determinations for habeas relief.  *See Love v. Martuscello*, No. 1:17-CV-6244, 2022 WL 2109244, at *8 (W.D.N.Y. June 10, 2022), *lv. appeal dismissed*, 2022 WL 17684817 (2d. Cir. Nov. 28, 2022), *cert. denied*, 143 S. Ct. 2441 (2023) (denying petitioner's argument that the factfinder "should have weighed the credibility of the witnesses differently and drawn alternate inferences from the proof," because "[n]either [courts] on direct appeal nor . . . federal habeas . . . [are] permitted to revisit the factfinder's determinations as to the witnesses' credibility and veracity.") (internal quotation marks and citations omitted).

The second concern with petitioner's arguments is his tendency to make a conclusory assertion about what the jury would determine based upon missing information.  Petitioner is asking the Court to engage in speculation and conjecture to arrive at the conclusion that Shapiro's medical records or journal included evidence with was intentionally omitted from the trial so that petitioner was prevented from establishing his actual innocence from the criminal charges.  *See Bruson v. Att'y Gen. of New Jersey*, No. 2:17-CV-6310, 2021 WL 4623296, at *3 (D.N.J. Oct. 7, 2021) (finding that the actual innocence gateway was

inapplicable where petitioner "presented no new evidence in support or his innocence . . . [and] instead . . . speculates as to what may result if a DNA test is conducted and if such a test returns verdicts in his favor.").  The Court refuses to utilize this equitable remedy under such hypothetical circumstances.

Most importantly, even if the evidence petitioner presently seeks could be deemed credible, his arguments are not compelling enough to show actual innocence.  In order to satisfy the actual innocence bar, "the new evidence [must] directly support[] petitioner's factual innocence by indicating either that he *did not* commit, or *could not* have committed, the crimes of conviction." *Hyman*, 927 F.3d at 665.   The petitioners in *McQuiggan*, *House*, *Schlup*, and *Rivas* provided the courts with such evidence.  *See McQuiggan*, 569 U.S. at 389 (affidavits pointing to another suspect); *House*, 547 U.S. at 540, 543-44 (new DNA evidence, testimony regarding possible contamination of evidence, and evidence regarding a different suspect indicating petitioner did not kill the victim, instead someone else had); *Schlup*, 513 U.S. at 307, 331 (sworn statements of eyewitnesses identifying different criminal participants and an affidavit providing petitioner with an alibi at the time of the crime, supporting defendant's innocence); *Rivas*, 687 F.3d at 528, 543-44 (affidavit from expert in forensic pathology identifying time of death of victim to be at a time when petitioner had an unchallenged alibi; thus petitioner could not have committed the murder).  Here, petitioner did not.

In making this determination, a court conducting an actual innocence analysis shall consider all evidence, even that which was illegally admitted or obtained, with proper consideration for the weight of that evidence given relevance and reliability.  *Hyman*, 927 F.3d at 658-59 (explaining Second Circuit interpretation of what evidence is permissible to

review during course of actual innocence claim).  For the reasons outlined above, evidence that either the victim or Schapiro were more intoxicated on the night of the accident or less severely impacted than their testimony indicated does not demonstrate that petitioner did not commit the crimes for which he was convicted: recklessly driving, while intoxicated, and causing injury to another.  When this Court considers all the relevant evidence, it is clear that petitioner has not made the showing necessary to pass through the narrow gateway for federal habeas review of his barred claims.

Finally, petitioner's attempts to advance new scientific conclusions through his Widemark Formula are unavailing.  Assuming that these self-generated figures can properly be considered new evidence, they are far from reliable or compelling.  First, they are not scientifically supported as petitioner cannot independently verify many of the pieces of evidence which he plugged into the formula.  Further, petitioner's calculations are not generated by recognized scientific protocols or derived from a credible or trustworthy eyewitness, but instead appear to be self-serving exculpatory statements proffered by a party to the case.  *See Colon v. Sheahan*, No. 1:13-CV-6744, 2016 WL 3919643, at *16 (S.D.N.Y. Jan. 13, 2016) (holding that "bare affidavits with no support proof, documentary or otherwise," are "not sufficiently reliable.").  Finally, these calculations do not rely upon the discovery of, or otherwise produce, critical physical evidence.  Instead, petitioner seeks to have the Court rely on unverified conclusions, based upon the musings of an interested individual with a vested interest in the outcome of the petition, yet with no apparent specialized knowledge or skill to produce legitimate, verifiable, and reproducible results.  *See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("To demonstrate innocence so convincingly that no reasonable juror could convict, a prisoner must have documentary, biological (DNA), or other powerful

evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim.").

In conclusion, the petitioner has failed to establish an equitable exception that will save his petition from being time-barred.

**V.    CONCLUSION**

**WHEREFORE**, it is

**ORDERED** that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in its entirety**;** and it is further

**ORDERED** that no Certificate of Appealability ("COA") shall issue because petitioner has failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires;[9] and it is further

**ORDERED** that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision upon the parties in accordance with the Local Rules.

Dated: <u>February 28, 2025</u>

Brenda K. Sannes
Chief U.S. District Judge

---

[9]  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).